## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

_____

### No. 22-2142

_____

UNITED STATES OF AMERICA,

          **Plaintiff-Appellee,**

v.

DOUGLAS D. SMITH,

          **Defendant-Appellant**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
DISTRICT COURT NO. 1:18-CR-3495 JCH
THE HONORABLE JUDITH C. HERRERA

_____

### BRIEF OF THE PUEBLOS OF SANTA CLARA, ACOMA, COCHITI, ISLETA, LAGUNA AND ZIA, AND THE ZUNI TRIBE, AND THE ALL PUEBLO COUNCIL OF GOVERNORS AS *AMICI CURIAE*, IN SUPPORT OF THE UNITED STATES, SUPPORTING AFFIRMANCE OF THE DECISION BELOW ON JURISDICTION

_____

**Richard W. Hughes**
**Donna M. Connolly**
Rothstein Donatelli LLP
1215 Paseo de Peralta
Santa Fe, New Mexico 87501
505-988-8004
rwhughes@rothsteinlaw.com
dconnolly@rothsteinlaw.com
*Attorneys for the Pueblos of Santa Clara, Acoma, and Laguna, and the All Pueblo Council of Governors*

**C. Bryant Rogers**
VanAmberg, Rogers, Yepa, Abeita, Gomez & Wilkinson LLP
347 East Palace Avenue
Santa Fe, New Mexico 87501
505-988-8979
cbrogers@nmlawgroup.com
*Attorneys for Pueblo of Cochiti*

**Lindsay Cutler**
Pueblo of Isleta
3950 NM-47
Isleta, New Mexico 87022
505-869-9828
Lindsay.cutler@isletapueblo.com
*Attorney for Pueblo of Isleta*

**David C. Mielke**
Sonosky, Chambers, Sachse,
Mielke & Brownell, LLP
500 Marquette Avenue NW, Suite 660
Albuquerque, NM 87102
(505) 247-0147
dmielke@abqsonosky.com
*Attorney for the Pueblo of Zia and
Zuni Tribe*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... ii

INTEREST OF AMICI CURIAE ........................................................1

ARGUMENT .......................................................................................4

    I.     Summary of the Argument ....................................................4

    II.    Introduction  ..........................................................................5

    III.   The Pueblo Lands Act was Not Intended to Reduce Lands, but to Avoid Displacing Non-Indian Settlers....................................................6

    IV.   The Supreme Court's Diminishment Cases Establish a High Bar for Finding of Diminishment................................................................11

    V.    Seen in the Light of the Supreme Court's Diminishment Cases, it is Clear that the PLA Did Not Diminish Pueblo Indian Country....... 17

    VI.   Decisions of this Court Refute Appellant's Contentions.................... 23

    VII.  Congress had Ample Authority to Enact the 2005 Pueblo Lands Act Amendments.................................................................... 24

CONCLUSION .................................................................... 26

CERTIFICATE OF SERVICE .......................................................... 28

CERTIFICATE OF COMPLIANCE ................................................. 29

CERTIFICATE OF DIGITAL SUBMISSION ................................. 30

# TABLE OF AUTHORITIES

## NEW MEXICO CASES

*Blatchford v. Gonzales*,
 1983-NMSC-060, ¶ 9, 100 N.M. 333 ........................................................6

*State v. Romero*,
 2006-NMSC-039, 142 P. 3d 887 .........................................................3, 6

## FEDERAL CASES

*Alaska v. Native Village of Venetie*,
 522 U.S. 520 (1998) ..........................................................................6

*DeCoteau v. District County Court*,
 420 U.S. 425 (1975) ........................................................ 12, 13, 14, 19

*Haaland v. Brakeen*,
 No. 21-376, slip op. (U.S., June 15, 2023) ...........................................25

*Hagen v. Utah*,
 510 U.S. 399 (1994) ........................................................ 12, 13, 14, 19

*Hydro Resources, Inc. V. U.S. Environmental Protection Agency*,
 601 F.3d 1131 (10th Cir. 2010) ……………………….…………………………22

*Lone Wolf v. Hitchcock*,
 187 U.S. 553 (1903) ......................................................................... 15

*Mattz v. Arnett*,
 412 U.S. 481 (1973) ........................................................ 12, 15, 20, 22

*McGirt v. Oklahoma*,
 140 S.Ct. 2452 (2020) ..................................................... 12, 14, 16, 18

*Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*,
 472 U.S. 237 (1985) .................................................................. 8, 9, 10

*Nebraska v. Parker,*
  577 U.S. 481 (2016) ..................................................................... 12, 15

*Oklahoma v. Castro-Huerta,*
  142 S.Ct. 2486 (2022) ....................................................................24

*Rosebud Sioux Tribe v. Kneip,*
  430 U.S. 584 (1977) ....................................................... 12, 13, 14, 19

*Seymour v. Superintendent,*
  368 U.S. 351 (1962) ..................................................................11,15, 20

*Solem v. Bartlett,*
  465 U.S. 463 (1984) .................................... 5, 11, 12, 15, 17, 18, 19, 23

*South Dakota v. Yankton Sioux Tribe,*
  522 U.S. 329 (1998) ....................................................... 12, 13, 14, 18, 20

*United States v. Alonzo,*
  249 F.2d 189 (10th Cir. 1957)..............................................................23

*United States v. Antonio,*
  936 F.3d 1117 (10th Cir. 2019)..............................................................23

*United States v. Candelaria,*
  271 U.S. 432 (1926) ...............................................................5, 10, 11

*United States v. Celestine,*
  215 U.S. 278 (1909) ................................................................ 16, 23

*United States v. Chavez,*
  290 U.S. 357 (1933) ......................................................................11

*United States v. John,*
  437 U.S. 634 (1978) ......................................................................25

*United States v. Joseph,*
  94 U.S. 614 (1876) ...............................................................7, 8, 9, 11

*United States v. Lara*,
  541 U.S. 193 (2004) ............................................................25

*United States v. Mazurie*,
  419 U.S. 544 (1975) ............................................................25

*United States v. Sandoval*,
  231 U.S. 28 (1913) ............................................... 5, 7, 8, 9

**FEDERAL STATUTES**

18 U.S.C. § 1151 ...................................................4, 5, 11, 24

Act of Feb. 27, 1851,
  c. 13, 9 Stat. 574 ................................................................6

Act of July 22, 1854,
  c. 103, 10 Stat. 308 ............................................................7

Act of Dec. 22, 1858,
  c. 5, 11 Stat. 374 ............................................................1, 7

General Allotment Act, Act of Feb. 8, 1887,
  24 Stat. 388 (25 U.S.C §§ 331 *et seq*) ...............................13

Indian Reorganization Act, Act of June 18, 1934,
  c. 576, 48 Stat. 984 (25 U.S.C. §§ 461 *et seq*) ....................13

New Mexico Enabling Act, Act of June 20, 1910,
  36 Stat. 557 ....................................................................20

Nonintercourse Act,
  25 U.S.C. § 177……………………………………………...…….5, 6, 7, 10

Pueblo Lands Act of 1924, Act of June 7, 1924,
  c. 331, 43 Stat. 636 (25 U.S.C § 331 note).................... 1, 9, 23

Pueblo Lands Act Amendments of 2005,
  Pub. L. 109-133, 119 Stat. 2573 (25 U.S.C § 331 note) .................. 2, 3, 4, 24, 25

Treaty of Guadalupe Hidalgo,
   9 Stat. 922 (July 4, 1848) ...........................................................................6

**OTHER AUTHORITIES**

Ebright, Hendricks and Hughes, FOUR SQUARE LEAGUES: PUEBLO INDIAN LANDS IN
   NEW MEXICO (UNM Press: 2014) ……………………………… 6, 9, 10, 18, 22

Kelly, THE ASSAULT ON ASSIMILATION: (UNM Press: 1983) …………………..22

**INTEREST OF AMICI CURIAE**

*Amici curiae* Pueblos of Santa Clara, Acoma, Cochiti, Isleta, Laguna, and Zia, and the Zuni Tribe (the "Pueblos") are federally recognized self-governing Indian tribes in New Mexico, for whom the Court's decision in this case will be consequential. *Amicus curiae* All Pueblo Council of Governors ("APCG") is an organization that advocates on behalf its member pueblos. Because the crime at issue occurred on non-Indian-owned private claim land ("private claim") within the Pueblo of Santa Clara's grant lands, this brief focuses on those grant lands, but the following analysis is applicable specifically to all pueblos that have private claims within their grants (such as *amici* Pueblos of Cochiti, Isleta, and Laguna, and the Zuni Tribe), and, more broadly, to all pueblos with grant lands, even without private claims within the boundaries (such as *amici* Pueblos of Acoma and Zia).

The Pueblo of Santa Clara's core landholding is known as the Santa Clara Pueblo Grant, a tract of approximately 17,350 acres centered on the Pueblo's ancient village, which was recognized as Santa Clara land under the Spanish and Mexican regimes and confirmed by Congress by the Act of December 22, 1858, c. 5, 11 Stat. 374, as item (K). Much of the City of Española, New Mexico, grew up within the exterior boundaries of the Grant, and as will be explained, under the terms of the Pueblo Lands Act of 1924, Act of June 7, 1924, c. 331, 43 Stat. 636,

1

nearly one-fourth of the Pueblo's lands were patented to non-Indians—a greater loss of land than that of any other Pueblo. But the Pueblo retains ownership of many parcels of land within the mass of private claims, and it has always maintained governmental authority over its members and other Indians throughout its Grant lands, regardless of land titles, and looks to the United States to exercise jurisdiction over incidents that involve Pueblo members or other Indians when the Pueblo lacks the legal authority to take action, such as when incidents involve non-Indians and arise on private claims within the Grant.

The crime committed by Appellant Smith occurred on a private claim within the Santa Clara Pueblo Grant, and his young victim, Maria Gallegos, was a member of the Pueblo. Appellant's crime thus should clearly be subject to federal jurisdiction, particularly considering the Pueblo Lands Act Amendments of 2005, Pub. L. 109-133, 119 Stat. 2573, by which Congress expressly stated that federal courts would have jurisdiction over crimes against Indians committed "anywhere within the exterior boundaries" of pueblo grants. Appellant's assertion that the federal court lacked jurisdiction over his prosecution seriously threatens the Pueblos' ability to exercise jurisdiction over their own members and other Indians with respect to acts on private claims within their Grants, would leave the United States powerless to prosecute crimes against tribal members or other Indians on private claims, and would seriously impede ordinary law enforcement. Because of

the checkerboard patterns of land ownership within many pueblo grants, law enforcement officers might need surveys in many instances to determine whether a particular incident was subject to state or federal (or tribal) jurisdiction. *Amici* were instrumental in obtaining the enactment of the 2005 PLA Amendments, and Defendant's baseless attack on the constitutionality of that enactment threatens to turn private claims within Pueblo grants into lawless zones, where Pueblo members and other Indians may be killed or injured by non-Indians with impunity, and upend well established congressional authority to legislate in this area.[1] For all of these reasons, *Amici* have a profound interest in the outcome of this appeal, and their Tribal Councils and APCG wish to be heard on the jurisdictional issue and have unanimously authorized the filing of this brief.  (*Amici* take no position on Appellant's claim that his sentence should be reduced.)

No person other than the Pueblos' attorneys had any role in authoring this brief, and its preparation and filing were funded solely by Pueblo funds. Fed. R. App. P. 29(a)(4)(E).

---

[1]In 2006, the New Mexico Supreme Court decided *State v. Romero*, 2006-NMSC-039, 142 P. 3d 887, in which it held that private claims within Pueblo grants continued to be Indian country, such that the State did not have jurisdiction to prosecute crimes by or against Indians that occur on such tracts. Considering that decision, were Appellant's claim successful here, neither the State nor the United States would have jurisdiction to prosecute such crimes occurring on private claims.

## ARGUMENT

### I.    Summary of the Argument.

Appellant makes essentially two arguments in support of his contention that the crime he committed was not subject to federal jurisdiction because it did not occur within Indian country: first, he contends that the specific parcel on which the crime occurred does not come within any of the categories of Indian country set forth in 18 U.S.C. § 1151, App.Br. 20-25, and second, he claims that the patenting of private lands under the Pueblo Lands Act (hereinafter, "PLA") diminished the Indian country status of Pueblo lands. *Id*., 26-33. Appellant is wrong on both counts. It is well established that Pueblo grants have constituted Indian country from the time the grants came under American jurisdiction. The law is clear that once established, land remains Indian country, regardless of a change in title, unless Congress takes steps to remove it from that status—a process referred to in the case law as "diminishment."  The Supreme Court's diminishment cases, which Appellant does not discuss, make clear that there is no basis for finding any intent in the PLA to diminish Pueblo Indian country.

Finally, if, as *Amici* contend, the land where Appellant's crime occurred remains Indian country, there is nothing left of Appellant's constitutional argument that Congress lacked authority to enact the 2005 Amendments to the PLA.

## II.    Introduction.

"Indian country," the term of art used to identify the geographic area within which the special rules of Indian law apply, is defined in 18 U.S.C. § 1151: "(a) all land within the limits of any Indian reservation . . . notwithstanding the issuance of any patent . . . (b) all dependent Indian communities . . . (c) all Indian allotments . . . ."  The inclusion of the phrase "notwithstanding the issuance of any patent" in clause (a) confirmed that Indian country status is not determined solely by Indian ownership. *See Solem v. Bartlett*, 465 U.S. 463, 468 (1984) ("Congress uncouple[d] reservation status from Indian ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians within reservation boundaries."). The language of clause (b) was taken directly from the decision in *United States v. Sandoval*, 231 U.S. 28 (1913), in which the Court established that Pueblo members are "Indians" subject to federal jurisdiction, and that their lands are likewise subject to federal authority. The Court explained that the Pueblos are "dependent communities entitled to [the government's] aid and protection, *like other Indian tribes.*" *Id*. at 47 (emphasis added). There is thus no basis for treating Pueblo Indian country any differently from that of reservation tribes, and the same diminishment analysis should apply to the Pueblos' grant lands as it does to reservation lands. *See United States v. Candelaria*, 271 U.S. 432, 441 (1926) (Pueblos fall "fairly within" the language of the Nonintercourse Act, "'any tribe of

Indians.'"). As the New Mexico Supreme Court has observed, "Indian reservations and dependent Indian communities are not two distinct definitions of place, but definitions which largely overlap." *Blatchford v. Gonzales*, 1983-NMSC-060, ¶ 9, 100 N.M. 333, 335. *See also Alaska v. Native Village of Venetie*, 522 U.S. 520, 528 (1998) (Pueblo lands satisfy "set-aside" and "federal superintendence" requirements to qualify as Indian country); *Romero*, 2006-NMSC-039, ¶ 19 (Pueblo land "sufficiently similar to a reservation" to merit identical treatment with respect to status of fee lands).

### III.    The Pueblo Lands Act was Not Intended to Reduce Pueblo Lands, but to Avoid Displacing Non-Indian Settlers.

When the United States acquired the territory of New Mexico from Mexico by the Treaty of Guadalupe Hidalgo, 9 Stat. 922 (July 4, 1848), Congress acted quickly to assert the full measure of federal protection and supervision over the Pueblo Indians and their lands.  By the Act of Feb. 27, 1851, c. 13, §§ 5, 7, 9 Stat. 574, 587, Congress extended the provisions of the Indian Nonintercourse Act[2] to the Indian tribes within the Territories of New Mexico and Utah,[3] and it authorized

---

[2]The so-called Nonintercourse Act, codified at 25 U.S.C. §177, prohibits any loss or transfer of Indian lands or any interest therein except with the approval of Congress.

[3]In 1851, the Utah and New Mexico territories comprised all the Mexican Cession, except for California, which had become a state in 1850. Ebright, Hendricks and Hughes, FOUR SQUARE LEAGUES: PUEBLO INDIAN LANDS IN NEW MEXICO (UNM Press: 2014) (hereinafter, "FOUR SQUARE LEAGUES") at 242 n. 24; 243 n. 33.

the appointment of four Indian agents for New Mexico. In 1854, as a first step in

ascertaining the private titles that had been established under Spanish and Mexican

rule, Congress created the office of Surveyor-General for New Mexico, and it

directed him, as one of his first tasks, to report on the location, population, and title

status of the lands of each of the Pueblos. Act of July 22, 1854, c. 103, §§ 8, 10

Stat. 308, 309. The first Surveyor-General, William Pelham, soon recommended

the confirmation of seventeen Pueblo grants, which Congress confirmed by the Act

of Dec. 22, 1858, c. 5, 11 Stat. 374. Thereafter, Congress regularly included the

Pueblo Indians among the Indian tribes and bands being served by the federal

Indian Service. *See Sandoval*, 231 U.S. at 39-40 and n.1.

In 1876, however, the federal judicial branch took a different course, one

that was directly at odds with established congressional policy. In that year, the

United States Supreme Court held that the Pueblo Indians could not be considered

Indians within the meaning of the Nonintercourse Act. *United States v. Joseph*, 94

U.S. 614 (1876). That decision, which left Pueblo lands unprotected by federal law

restrictions on alienation, exacerbated the flood of non-Indian encroachments onto

Pueblo lands. During the ensuing decades, thousands of non-Indians, some with

deeds obtained in various ways from the tribes (or individual Indians), some

without, established homes and farms on the Pueblo grants, but none of them with

the federal approval that would be required to occupy Indian lands under federal

supervision. *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana*, 472 U.S. 237, 240-43 (1985). Because of *Joseph*, and several Territorial Court decisions that mirrored its ruling, the United States Attorney for the Territory was repeatedly thwarted in his efforts to eject trespassing non-Indians from Pueblo land. But as the Court explained in *Sandoval*, despite the ruling in *Joseph*, Congress and the executive branch continued to treat the Pueblo Indians as Indians under federal authority and supervision, like all other Indian tribes. 231 U.S. at 40-44.

Congress' determination to apply federal Indian country laws to the Pueblos and their lands ultimately led the Supreme Court to reconsider the Pueblos' status. In *Sandoval*, the Court acknowledged that, in the face of the ruling in *Joseph*, Congress had consistently treated the Pueblos "as requiring special consideration and protection, like other Indian communities." *Id.* at 39. Though it noted that Congress could not arbitrarily designate a group of people as an Indian tribe, the Court observed that "in respect of distinctly Indian communities," such as the Pueblos, it was up to Congress, not the courts, to determine "whether, to what extent and for what time" they would be regarded as requiring the guardianship and protection of the United States. *Id*. at 46. Congress, the Court conceded, had plainly treated the Pueblo Indians as "dependent communities entitled to [the federal government's] aid and protection, like other Indian tribes," and it held that that determination "must be regarded as both authorized and controlling." *Id*. at

8

47. That being so, the Court upheld Congress' authority to control the entry of liquor into Pueblo grant lands, that is, into Pueblo Indian country. *Id.* at 48. The Court did not regard as being of any material consequence that Pueblo grants were held by the Pueblos in fee, rather than by the United States in trust, noting that the same was true of the lands held by the Five Civilized Tribes of Oklahoma. *Id.* The Court instead recognized that Congress could extend its authority over such fee lands "in the exercise of the government's guardianship over those tribes and their affairs." *Id.*

By undermining the premise of *Joseph*, that Pueblo Indians were not Indians subject to federal superintendence, *Sandoval* "cast a pall" over the titles of the non-Indians who had settled on Pueblo lands, "suggesting that the Pueblos had been wrongfully dispossessed of their lands." *Mountain States*, 472 U.S. at 243. The non-Indians' worst fears were soon realized. Within a few years after *Sandoval*, the United States Attorney began filing thousands of ejectment suits against non-Indians who had settled on Pueblo grant lands. FOUR SQUARE LEAGUES, at 267. The ensuing political uproar eventually led to the enactment of the PLA in 1924, to "settle the complicated questions of title and to secure for the Indians all of the

9

lands to which they are equitably entitled." *Mountain States*, 472 U.S. at 244 (quoting S. REP. NO. 492, 68th Cong. 1st Sess. at 5 (1924)).[4]

The PLA allowed non-Indians residing on Pueblo lands to file claims for the lands they were occupying, and if they could show that they satisfied certain criteria as to length and exclusiveness of occupancy, color of title, and payment of taxes, they would receive the equivalent of a quitclaim deed for those lands from the United States, with the Pueblos receiving compensation at fair market value. PLA, §§ 4, 6, 43 Stat. 637-38. This compensation was to be used by the Secretary of the Interior to acquire replacement lands (and for other limited purposes), preferably through reacquisition of land within Pueblo grants, *id.*, § 19, 43 Stat. 642, evincing Congress' purpose to limit the Pueblos' losses of land as much as possible. Today, virtually all remaining non-Indian-owned lands within the exterior boundaries of Pueblo grants in New Mexico derive from quitclaim deeds issued to claimants under the PLA.

Two years after Congress enacted the PLA, the Supreme Court decided *United States v. Candelaria*, 271 U.S. 432 (1926), in which it clearly held that the Pueblos were Indian tribes within the meaning of the Nonintercourse Act, and that their lands were Indian country, fully protected by federal law. *Id*. at 441-42.

---

[4] For a detailed account of the circumstances that led to the enactment of the PLA, and of the tortuous course of that law's enactment and implementation, *see* FOUR SQUARE LEAGUES at 237 -91.

*Candelaria* thus expressly overruled *Joseph* and put to rest the unfortunate

aberration that it had represented.  *See also United States v. Chavez*, 290 U.S. 357

(1933).

In short, Pueblo grant lands, though held in fee, have constituted Indian

country since their incorporation into the United States. The question presented

here is whether, in enacting the PLA, Congress intended to reduce, or diminish,

Pueblo Indian country by the patenting of lands to non-Indians. The Pueblo

submits that that question is answered in *Solem*, in which the Supreme Court held

that once Indian country is shown to exist, it retains that status "until Congress

explicitly indicates otherwise." 465 U.S. at 470. As will be shown, there is no

language in the PLA that would indicate any change in the Indian country status of

the private claims.[5]

## IV.    The Supreme Court's Diminishment Cases Establish a High Bar for a Finding of Diminishment.

Beginning with the case of *Seymour v. Superintendent*, 368 U.S. 351 (1962),

the Supreme Court has decided a series of cases addressing the question whether

Acts of Congress that opened all or parts of particular Indian reservations to

---

[5]This is why Appellant's argument that his property does not now fit within any of
the categories of Indian country described in 18 U.S.C. § 1151, App. Br. at 22-25,
is completely beside the point. The land was unquestionably Indian country before
it was patented to Appellant's predecessors. The issue is whether Congress
intended that the patent, alone, changed that status. The answer, as shown in the
text, is clearly "no."

allotment and non-Indian settlement had the effect of diminishing the reservations and removing the "Indian country" status of those lands. *See also, Mattz v. Arnett,* 412 U.S. 481 (1973); *DeCoteau v. District County Court*, 420 U.S. 425 (1975); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584 (1977); *Solem*, 465 U.S. at 463; *Hagen v. Utah*, 510 U.S. 399 (1994); *South Dakota v. Yankton Sioux Tribe*, 522 U.S. 329 (1998); *Nebraska v. Parker*, 577 U.S. 481 (2016); *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020).

The governing principles established by these cases are that "[d]iminishment will not be lightly inferred," and that "[o]nce a block of land is set aside for an Indian Reservation *and no matter what happens to the title of individual plots within the area*, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem*, 465 U.S. at 470 (emphasis added). The Court has consistently followed the pattern established in *Solem*, that a court looks first to the statutory language to determine whether diminishment of the reservation was intended, then, if doubt remains, to the circumstances surrounding the enactment (or the negotiation of the agreement with the tribe, if there was one), and finally to the historical treatment of the land thereafter, though this factor is given far less weight. *See, e.g., Nebraska*, 577 U.S. at 488. Moreover, in *McGirt*, the Court made clear that if the statutory language is unambiguous, the inquiry stops there. 140 S.Ct. at 2468.

The Supreme Court cases in which diminishment was held to have occurred, (*DeCoteau*, *Rosebud Sioux*, *Hagen* and *Yankton Sioux)* arose from reservation-opening statutes,[6] and three of those cases involved agreements entered into between the government and the tribes concerned, in which the tribes agreed to relinquish any interest in their unallotted lands for fixed sums.

In *DeCoteau*, for example, which involved the former Lake Traverse Reservation in South Dakota, the Sisseton and Wahpeton Bands of Sioux Indians agreed in 1889 to sell their entire reservation, except for the allotments, back to the United States, for a sum certain, stating in the agreement that they "cede, sell, relinquish and convey" all the unallotted lands.  420 U.S. at 435-36. In 1891, Congress passed an Act ratifying that agreement. *Id*. at 436-37. The Court viewed

---

[6]"Reservation-opening" statutes generally followed the plan of the General Allotment Act, Act of Feb. 8, 1887, 24 Stat. 388 (also known as the "Dawes Act"), which authorized the President to "open" parts or all of Indian reservations selected by him, such that each individual Indian would receive an allotment, usually of 160 acres in size, to be held in trust for 25 years, and the remaining tribal land within the "opened" portion would be restored to the public domain and opened to settlement by non-Indians under the homestead laws. It was speculated that the industriousness of their new non-Indian neighbors would inspire the Indians to become sturdy agriculturalists. *See, e.g., Yankton Sioux*, 522 U.S. at 335. But successive Presidents were reluctant to exercise this authority, and thus Congress resorted to separate legislation to open particular reservations, generally along the lines of the Dawes Act. Of course, the allotment policy failed entirely to achieve its presumed goals, other than the fact that it caused the loss of about 100 million acres of Indian trust land. The policy was finally scrapped, and the trusteeship of the remaining allotments extended permanently, with the enactment of the Indian Reorganization Act, Act of June 18, 1934, c. 576, 48 Stat. 984 (originally codified at 25 U.S.C. §§ 461 et seq.).

the "cession" language as determinative of the loss of Indian country status; *see also McGirt*, 140 S.Ct. at 2489 (Roberts, C.J., dissenting) ("'cession' is generally what a tribe does when it conveys land to a fellow sovereign").

In *Rosebud Sioux*, a majority of adult male tribal members agreed to three successive agreements to allow portions of the reservation to be opened, and the unallotted portions to be sold for a "sum certain." 430 U.S. at 587-88. The Court found it significant that the congressional reports on the Acts that ratified those agreements repeatedly referred to the reduced size of the Rosebud reservation, and the agreements stated that the tribe did "cede, surrender, grant and convey, . . . all their claim, right, title and interest" to the unallotted lands in the opened portions. *Id*. at 597-98.

*Yankton Sioux* likewise involved an 1892 agreement (ratified in 1894) by which the tribe agreed to "cede, sell, relinquish and convey" all its unallotted lands, for a sum certain, to the United States. 522 U.S. at 337-38. The record of the negotiations of the agreement indicated that the tribal leaders understood that after the transaction was concluded they would no longer have a reservation. As the Court noted, "[t]his 'cession' and 'sum certain' language is 'precisely suited' to terminating reservation status." *Id*. at 344 (quoting *DeCoteau*, 420 U.S. at 445).

In *Hagen*, the Ute Tribe of the Uintah Reservation (now known as the Uintah and Ouray Reservation) in Utah repeatedly refused to agree to the sale of

14

unallotted lands in a portion of the reservation that had been opened by Congress. 510 U.S. at 402-03. But after the decision in *Lone Wolf v. Hitchcock*, 187 U.S. 553 (1903), which held that Congress could unilaterally abrogate Indian treaties, Congress passed a law stating that the unallotted lands in the Uintah Reservation would be "restored to the public domain." *Id*. at 404-07. President Roosevelt issued a proclamation in 1905 effectuating that Act. The Court viewed the "restored to the public domain" language as determinative, seeing that as inconsistent with the idea that the lands continued to be "reserved" for any special federal purpose. *Id*. at 412-13.

In contrast, in most of the cases in which the Court found no diminishment had occurred (*e.g.*, *Seymour*, *Mattz*, *Solem* and *Nebraska)*, there were no agreements of cession by the tribes, and the language of the opening Acts merely referred to the reservations (or portions) as being opened to settlement by non-Indians, with the proceeds from sales to the settlers being set aside for the benefit of the tribes. As the Court said in *Seymour*, the Act in question there "did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government . . . regarded as beneficial to the development of its wards." 368 U.S. at 356. Mere conveyance of title to non-Indians was insufficient to demonstrate diminishment, notwithstanding some language suggesting otherwise. More to the point, in *Solem* the Court observed that

15

"[o]nce a block of land is set aside for an Indian Reservation *and no matter what happens to the title of individual plots within the area,* the entire block retains its reservation status until Congress explicitly indicates otherwise." 465 U.S. at 469 (*citing United States v. Celestine*, 215 U.S. 278, 285 (1909)) (emphasis added).

Finally, in *McGirt*, the government had entered into an agreement with the Creeks in 1901, but it was solely for issuance of allotments to individual Creek members. The Creeks refused to agree to cede any lands. 140 S.Ct. at 2463. Although in 1906 and 1908, Congress enacted laws that sought to reduce the governmental authority of the tribe, there was no language in those or subsequent acts that could be construed to terminate the reservation. *Id*. at 2466. Consequently, the Court held that the Creek Reservation still exists, encompassing (among other locales) almost the entire city of Tulsa.

The Pueblos submit that, as will be shown in the next section, the sound and consistent reasoning of these cases forces the conclusion that the Pueblo Lands Act had no impact on the Indian country status of the patented lands within the Pueblo grants.

**V.     Seen in the Light of the Supreme Court's Diminishment Cases, it is Clear that the PLA Did Not Diminish Pueblo Indian Country.**

Diminishment "will not be lightly inferred."  *Solem*, 465 U.S. at 470. Multiple factors derived from the Supreme Court's line of cases in this field show that there is no basis whatsoever to support the claim that the patenting of Pueblo lands to non-Indian trespassers terminated the Indian country status of such lands.

The Supreme Court has found the historical and legislative context of each of the statutes under consideration as strongly indicative of Congress' intent. The allotment or reservation-opening acts that were central to the analysis in each of the diminishment cases were unquestionably intended as preludes to the end of the reservation system. As the Court said in *Solem*, "the Congresses that passed the surplus land acts anticipated the imminent demise of the reservation, and in fact passed the acts partially to facilitate the process."  465 U.S. at 468. Those acts were expressly intended to acquire Indian land and make it available to non-Indians for settlement. The PLA, on the other hand, was an act of grace to non-Indians who faced expulsion from the Pueblo lands they had settled on, without federal (or in many instances, tribal) consent. There is no evidence whatever that Congress saw the PLA as a first step in eliminating the Pueblos' control of their lands; rather, it was solely intended to provide good titles to the settlers who met the Act's criteria, to keep them from being ejected. Further, the allotment acts from which the Court inferred diminishment opened huge swaths of reservation land, or sometimes the

entire reservation, to non-Indian settlement. The PLA, in contrast, required a tract-by-tract analysis of whether each claimant satisfied the Act's criteria.[7]

Importantly, none of the Pueblos entered into any kind of agreement with the United States relative to the patenting of lands to the settlers, as the tribes had in most of the cases in which the Court found diminishment had occurred. In fact, the Pueblos opposed the PLA's enactment, ardently tried to insert language into the bill that became the PLA that would limit the success rate of the non-Indian claims (though those efforts, even when successful in Congress, were often thwarted by the Pueblo Lands Board and the courts; *see* FOUR SQUARE LEAGUES at 277-84), and occasionally tried to challenge the Board's findings in court.  Under no circumstances could it be said that the Pueblos sought or agreed to the settlers' occupancy of their property.

The most important consideration in determining whether Congress intended to diminish a tribe's Indian country, the Supreme Court has held, is the statutory language. *See, e.g., McGirt*, 140 S.Ct. at 2468. Although the Court has said that there are no "magic words" evidencing diminishment, certain words such as "cede" or "cession," have been treated as having special significance in this regard.

---

[7] As the Court said in *Yankton Sioux*, "if a surplus land Act 'simply offered non-Indians the opportunity to purchase land within established reservation boundaries,' . . . then the entire opened area remained Indian country." 552 U.S. at 343 (quoting *Solem*, 465 U.S. at 470).

*See, e.g., DeCoteau*, 420 U.S. at 439 (noting "cession" language in agreement with tribe); *Rosebud Sioux*, 430 U.S. at 596-97 (1904 Act incorporated "verbatim the language of immediate cession"); *Solem*, 465 U.S. at 474 (no "cession" language in Cheyenne River Act). Restoration of lands to the "public domain" has also been found to be strongly indicative, as in *Hagen*; *see also DeCoteau*, 420 U.S. at 446. No such terms appear in the PLA. Rather, its language, when referring to the lands to be patented to non-Indians, speaks only of the transfer of title, and although the words "extinguish" and "relinquish" appear, they are clearly referring to loss of ownership. For example, in Section 2, the Board is to report and describe by metes and bounds those Pueblo lands "title to which the said board shall find not to have been extinguished."  43 Stat. 636. Section 5 provides that successful claimants shall be entitled to a decree in their favor, "which shall have the effect of a deed of quitclaim as against the United States and said Indians."  *Id.* at 637. By Section 13, the Secretary of the Interior is to file field notes and plats "showing the lands to which the Indian title has been extinguished," and the Secretary shall issue to each successful claimant "a patent or other certificate of title," which "shall have the effect *only of a relinquishment by the United States and the said Indians*." *Id*. at 640 (emphasis added). There is no mention of jurisdiction, or of the boundaries of Pueblo lands being adjusted, or of any "cession" by the Pueblos.  Rather, as in

*Seymour*, the PLA "did no more than open the way for non-Indian settlers to own land" within the boundaries of Pueblo grants. 368 U.S. at 356.[8]

In several of the diminishment cases, the Court placed weight on whether the Act in question provided for payment to the tribe of a sum certain—either a fixed total amount, or a fixed amount per acre—as compensation for the lands lost. *See, e.g., Yankton Sioux*, 522 U.S. at 344 ("cession" and "sum certain" language "precisely suited" to terminating reservation status). But that was not the scheme of the PLA. The compensation to the Pueblos was to be based on appraisals of the land and water rights they lost.

In *Mattz*, the Court noted with emphasis that prior to the 1892 Act that opened the Klamath River Reservation to allotment and settlement, several bills had been introduced into Congress that would have terminated the reservation "in unequivocal terms." 412 U.S. at 504. No such language was used in the bill that became the 1892 Act, and the Court viewed that fact as negating any possible inference that the 1892 Act was intended to terminate the reservation. 412 U.S. at

---

[8]Appellant claims that the language of the New Mexico Enabling Act, Act of June 20, 1910, 36 Stat. 557, supports his contention as to the effect of the PLA on Pueblo Indian country, App. Br. at 29-30, but this argument must be disregarded. It makes no sense to purport to construe a statute based on the language of an entirely different one enacted 14 years earlier, long before anyone had even dreamed of a Pueblo Lands Act.

504. A strikingly similar situation occurred in connection with the passage of the PLA.

One of the first bills to address the Pueblo lands situation was introduced by Sen. Holm O. Bursum of Socorro, New Mexico, who had been appointed by the Governor to take the Senate seat of Albert Fall, who had been named Secretary of the Interior by newly elected President Warren Harding. Bursum expected a tough race in the special election he faced, and he decided to take on the Pueblo land issue as the hero of the non-Indian settlers. (Pueblo members, of course, at that time still could not vote.)  The bill he introduced in mid-1922, S. 3855, would have been a disaster for the Pueblos. It would have confirmed the claims of all settlers who could prove occupancy before 1900, and many whose occupancy arose after that date, with no compensation to the Pueblos except for lands first occupied after 1900 without color of title. The bill would have given the federal courts unprecedented and wholly unwarranted jurisdiction over internal Pueblo governance; and most importantly here, Section 3 of the bill would have given the State and its courts complete *jurisdiction* over all the lands patented to the non-Indians—exactly what the Appellant in this case claims *did* happen under the PLA.

The bill actually passed the Senate, after Bursum and Fall (who later ended up in federal prison for his role in the Teapot Dome oil leasing scandal) falsely told a Senate committee that "all parties" to the dispute supported it. Soon after it

passed, however, Pueblo advocates in New Mexico learned of it, and began what

became a nationwide campaign  against "the infamous Bursum Bill," as the

legislation came to be known.[9]  The controversy became so intense that when

Congress reconvened after a brief recess, and before the House had taken any

action on the bill, Sen. William Borah of Idaho moved the Senate to recall the bill,

stating that the Senate "had been under a misapprehension as to what its terms

were."  Kelly, THE ASSAULT ON ASSIMILATION (UNM Press: 1983) at 223. The bill

was recalled, and Congress wrestled with the Pueblo lands issue for the next two

years before producing what became the PLA. But as has been noted, that

legislation contained nothing comparable to Section 3 of Sen. Bursum's bill. As in

*Mattz*, the fact that Congress rejected an earlier version of the Act that clearly

evinced an intent to diminish should weigh heavily against any finding that the

PLA resulted in the diminishment of Pueblo Indian country.[10]

In short, neither the language, the structure nor the circumstances

surrounding the enactment of the PLA bear any of the hallmarks that the Supreme

---

[9] This account is taken from, and is recounted in detail in, FOUR SQUARE LEAGUES, at 268-72.

[10] *Hydro Resources, Inc., v. U.S. Environmental Protection Agency*, 608 F.3d 1131 (10th Cir. 2010), relied on by Appellant, App. Br. at 23-24, is not to the contrary. The land at issue there, unlike the private claims within Pueblo grants, was never Indian country to begin with (other than during a brief period when it was within an area that was added to the Navajo Reservation, then was completely disestablished). The fact that it was surrounded by allotments and tribally held land did not change its status.

Court has held would support a finding of intent to diminish Pueblo Indian
country.[11]

## VI.     Decisions of this Court Refute Appellant's Contentions.

This Court has previously addressed the jurisdictional status of lands
patented under the PLA, and its decisions leave no doubt that such lands retain
their Indian country status. In *United States v. Antonio*, 936 F.3d 1117 (10th Cir.
2019), a case arising from a vehicular homicide by an Indian on a private claim
within the Sandia Pueblo Grant, the Court held that the PLA did not terminate
federal jurisdiction over lands within Pueblo grants. *Id*. at 1123. And in *United
States v. Alonzo*, 249 F.2d 189 (10th Cir. 1957), the Court dealt with the question of
the status of land that had been patented to non-Indians under the PLA, but then
reacquired by the Pueblo. The Court held that "the restrictions against alienation
apply to lands acquired by the Pueblo through purchase." *Id*. at 196. But this could

---

[11]Appellant argues that Congress would have "understood" in 1924 that
termination of Indian title to land would terminate federal jurisdiction. App. Br. at
26-33. It is probably correct that this was the conventional wisdom at the time, and
the Supreme Court has acknowledged that this was so at the time of the allotment
acts. *See, e.g., Solem*, 465 U.S. at 468 ("The notion that reservation status . . .
might not be coextensive with tribal ownership was unfamiliar at the turn of the
century.") *But see Celestine*, 215 U.S. at 285 ("when Congress has once established
a reservation, all tracts included within it remain a part of the reservation until
separated therefrom by Congress"). But regardless, that this may have been the
general understanding at the time has not prevented the Supreme Court from
finding that *no* diminishment was actually accomplished by the act in question.
*E.g., Solem,* 465 U.S. at 470.

only be true if those lands had not lost their "Indian country" status when formerly
patented to non-Indians.

## VII.   Congress had Ample Authority to Enact the 2005 Pueblo Lands Act Amendments.

Appellant argues that the enactment of the 2005 Pueblo Lands Act
Amendments, by Public Law 109-133, 119 Stat. 2573, by which Congress made
clear that exclusive federal and tribal criminal jurisdiction extends to Indian
persons and entities "anywhere within the exterior boundaries" of Pueblo grants,
was unconstitutional.  App. Br. at 36-39. The Pueblos submit that the foregoing
arguments, showing that, contrary to Appellant's claims, private claims within
Pueblo grants remain Indian country, disposes of this argument, as Congress
plainly has authority to legislate regarding jurisdiction within Indian country (as it
did, for example, with the enactment of 18 U.S.C. § 1151).  But Appellant goes
further, asserting that the PLA Amendments "involve neither commerce nor Indian
Tribes."  This is untrue. The 2005 Amendments speak directly to the jurisdiction of
Pueblos over lands within their grants, and to the exclusivity of federal jurisdiction
over crimes committed by or against Indian people or entities, or that involve any
Indian property or interest.[12]  Numerous Supreme Court decisions, including

---

[12] In 2022, the Supreme Court decided the case of *Oklahoma v. Castro-Huerta*, 142
S.Ct. 2486 (2022), in which it held, for the first time in more than two centuries of
Indian law jurisprudence, that states have jurisdiction that is concurrent with that of
the United States over crimes committed by non-Indians against Indians within

especially the Court's most recent ruling on the subject, have upheld congressional power to enact such legislation.  *See, e.g., Haaland v. Brakeen,* No. 21-376, slip op. at 10-12 (U.S., June 15, 2023) ("Congress' power in this field [of Indian law] is muscular, superseding both tribal and state authority."); *United States v. Lara*, 541 U.S. 193, 200 (2004) ("Constitution grants Congress broad general powers to legislate in respect to Indian tribes," including power to specify tribal jurisdiction over non-members); *United States v. Mazurie*, 419 U.S. 544, 546 (1975) (Congress has power to regulate introduction of liquor into Indian country, even onto non-Indian-owned private land); *United States v. John*, 437 U.S. 634, 652-53 (1978) (Congress retains power to designate lands "Indian country" despite State objection). The PLA Amendments are well within Congress's plenary power to legislate in the field of Indian affairs.

---

Indian country. The merits of that decision need not be discussed here but suffice it to say that the 2005 PLA Amendments completely preempt that ruling, and preclude any jurisdiction of the State, at least with respect to crimes committed against Indian persons by non-Indians within Pueblo grants in New Mexico. *Castro-Huerta* recognizes that Congress does have the power to pre-empt what the Court viewed as inherent state authority over such crimes, and thus essentially confirms the constitutionality of the 2005 Amendments. 142 S.Ct. at 2502-03. It might also be noted that *Castro-Huerta* deals only with whether *state* jurisdiction would exist within Indian country. This case is about the existence of *federal* jurisdiction.

## CONCLUSION

*Amici curiae* submit that for all the foregoing reasons, Appellant's arguments that the federal court lacked jurisdiction to convict him of murder of an Indian woman are completely without merit. On that issue, the district court should be affirmed.

Respectfully submitted.

/s/ *Richard W. Hughes*
Richard W. Hughes
Donna M. Connolly
Rothstein Donatelli LLP
1215 Paseo de Peralta
Santa Fe, New Mexico 87501
505-988-8004
rwhughes@rothsteinlaw.com
dconnolly@rothsteinlaw.com
*Attorneys for Pueblos of Santa Clara,*
*Acoma, and Laguna, and All Pueblo*
*Council of Governors*

C. Bryant Rogers
VanAmberg, Rogers, Yepa, Abeita,
Gomez & Wilkinson LLP
347 East Palace Avenue
Santa Fe, New Mexico 87501
505-988-8979
cbrogers@nmlawgroup.com
*Attorneys for Pueblo of Cochiti*

Lindsay Cutler
Pueblo of Isleta
3950 NM-47
Isleta, New Mexico 87022
505-869-9828
Lindsay.cutler@isletapueblo.com
*Attorney for Pueblo of Isleta*

David C. Mielke
Sonosky, Chambers, Sachse,
Mielke & Brownell, LLP
500 Marquette Avenue NW, Suite 660
Albuquerque, NM 87102
(505) 247-0147
dmielke@abqsonosky.com
*Attorney for the Pueblo of Zia and
Zuni Tribe*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 11th day of July, 2023, I filed the foregoing electronically through the court's CM/ECF system, which will send notification of such filing to the following:

Aric Grant Elsenheimer (**aric_elsenheimer@fd.org**), Counsel of Record for Appellant, Douglas D. Smith; and Tiffany L. Walters (**Tiffany.Walters2@usdoj.gov**), Counsel of Record for Appellee, the United States of America.

Date: July 11, 2023

/s/ *Richard W. Hughes*
Richard W. Hughes
Donna M. Connolly
Rothstein Donatelli LLP
1215 Paseo de Peralta
Santa Fe, New Mexico 87501
505-988-8004
rwhughes@rothsteinlaw.com
dconnolly@rothsteinlaw.com
*Attorneys for Pueblos of Santa Clara,*
*Acoma, Laguna, and All Pueblo*
*Council of Governors*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type Style Requirements

1. This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and the word limit of Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

[X] this document contains 6,485 words, or

[ ] this brief uses a monospaced typeface and contains <state the number of> lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[X] this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman font size 14, or

[ ] this document has been prepared in a monospaced typeface using <state name and version of word processing program> with <state number of characters per inch and name of type style>.

Date: July 11, 2023                /s/ *Richard W. Hughes*
                                   Richard W. Hughes
                                   Donna M. Connolly
                                   Rothstein Donatelli LLP
                                   1215 Paseo de Peralta
                                   Santa Fe, New Mexico 87501
                                   505-988-8004
                                   rwhughes@rothsteinlaw.com
                                   dconnolly@rothsteinlaw.com
                                   *Attorneys for Pueblos of Santa Clara,*
                                   *Acoma, Laguna, and All Pueblo*
                                   *Council of Governors*

**CERTIFICATE OF DIGITAL SUBMISSION**

I hereby certify that with respect to the foregoing:

(1) all required privacy redactions have been made per 10th Cir. R. 25.5;

(2) if required to file additional hard copies, that the ECF submission is an exact copy of those documents;

(3) the digital submissions have been scanned for viruses with the most recent version of a commercial virus scanning program, Microsoft Defender, version 1.393.761.0, updated on July 19, 2023 at 3:30 am, and according to the program are free of viruses.

_____ /s/ Richard W. Hughes_____