FILED
United States Court of Appeals
Tenth Circuit

May 7, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

─────────────────────────────

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DOUGLAS D. SMITH,

    Defendant - Appellant.

------------------------------------

STATE OF NEW MEXICO; PUEBLOS OF SANTA CLARA; ACOMA; COCHITI; ISLETA; LAGUNA AND ZIA; AND THE ZUNI TRIBE; AND THE ALL PUBELO COUNCIL OF GOVERNORS,

    Amicus Curiae.

No. 22-2142

─────────────────────────────

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:18-CR-03495-JCH-1)**

─────────────────────────────

Aric Grant Elsenheimer, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant Douglas Smith.

Tiffany L. Walters, Assistant United States Attorney, Albuquerque, New Mexico (Alexander M. M. Uballez, United States Attorney, with her on the brief), for Plaintiff-Appellee United States of America.

Raúl Torrez, Attorney General, Aletheia V.P. Allen, Solicitor General, Albuquerque, New Mexico, and Ellen Venegas, Assistant Attorney General, Santa Fe, New Mexico, filed an amici brief for the State of New Mexico, on behalf of Plaintiff-Appellee.

Richard W. Hughes and Donna M. Connolly, Rothsten Donatelli LLP, Santa Fe New Mexico, for Pueblos of Santa Clara, Acoma, and Laguna, and All Pueblo Council of Governors; C. Bryant Rogers, VanAmberg, Rogers, Yepa, Abeita Gomez & Wilkinson LLP, Santa Fe, New Mexico, for Pueblo of Cochiti; Lindsay Cutler, Pueblo of Isleta, Isleta, New Mexico, for Pueblo of Isleta; and David C. Mielke, Sonosky, Chambers, Sachse, Mielke & Brownell, LLP, Albuquerque, New Mexico, for Pulebo of Zia and Zuni Tribe, filed an amicus curiae brief on behalf of Plaintiff-Appellee.

_____

Before **HARTZ**, **EBEL**, and **CARSON**, Circuit Judges.
_____

**CARSON**, Circuit Judge.
_____

Indian Pueblo law is a jigsaw puzzle of statute, precedent, and history with pieces scattered across centuries. Though legitimate queries remain, this Court's precedent instructs us to recognize federal criminal jurisdiction over land owned by non-Indians within the exterior boundaries of a Pueblo. A federal jury convicted Douglas Smith—a non-Indian—of involuntary manslaughter for an act he committed on property located within the exterior boundaries of the Pueblo of Santa Clara. Defendant challenges the district court's jurisdiction and his sentence. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Defendant owned and lived at 826 N. Riverside Drive, Española, New Mexico. Although the property is located within the exterior boundaries of the Pueblo of Santa Clara, Defendant is not an Indian and owned fee simple title to the property.

In the early morning, Defendant saw Maria Gallegos trying to break into a trailer on his property. Defendant shot and killed Gallegos. The grand jury indicted Defendant with second-degree murder in violation of 18 U.S.C. § 1111, but a jury convicted Defendant of a lesser included offense—involuntary manslaughter in violation of 18 U.S.C. § 1112—and the district court sentenced Defendant to twenty-seven months' imprisonment.

Before trial, Defendant moved to dismiss the case for lack of federal jurisdiction, arguing (1) that the federal district court lacked criminal jurisdiction over crimes committed on his property, and (2) that Congress acted outside its constitutional authority when it passed the Indian Pueblo Land Act Amendments of 2005, Pub. L. No. 109–133, 119 Stat. 2573 ("2005 Amendment"). The district court denied his motion. Defendant appeals the district court's denial of his motion to dismiss and his sentence.

II.

We must decide whether federal criminal jurisdiction extends to land owned by a non-Indian within the exterior boundaries of a Pueblo. In addressing this question, we review a defendant's challenge to criminal jurisdiction de novo. United

States v. Brown, 164 F.3d 518, 521 (10th Cir. 1998) (citing United States v. Blackwell, 81 F.3d 945, 947 (10th Cir. 1996)).

A.

Congress has established federal criminal jurisdiction over crimes committed within "Indian country." 18 U.S.C. § 1152. As defined by 18 U.S.C. § 1151, "Indian country" refers to:

> (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.

To determine the reach of federal criminal jurisdiction, we must therefore decide whether the property on which Defendant shot Maria Gallegos is part of either an Indian reservation, a dependent Indian community, or an Indian allotment.

The Supreme Court defined the Pueblos as "dependent Indian communities" in United States v. Sandoval, 231 U.S. 28, 46–47 (1913). Thus, Pueblo lands are Indian country within the meaning of 18 U.S.C. § 1151(b) and subject to federal criminal jurisdiction under 18 U.S.C. § 1152. Accord United States v. Antonio, 936 F.3d 1117, 1121 (10th Cir. 2019). But 18 U.S.C. § 1151(b) "did not account for tracts of

land within the dependent Indian communities that were owned by non-Indians."[1] Antonio, 936 F.3d at 1121. Defendant therefore argues that his property is beyond federal criminal jurisdiction because a non-Indian owns it, though it is within the exterior boundaries of a Pueblo. We disagree.

Congress enacted § 12 of the Trade and Intercourse Act of 1834, prohibiting "purchase, grant, lease, or other conveyance of lands, or of any title or claim thereto, from any Indian nation or tribe of Indians." 25 U.S.C. § 177. Generally speaking, this statute prevented Indian nations and tribes from "convey[ing] good title to their lands." Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 242 (1985).

In 1848 the United States signed the Treaty of Guadalupe Hidalgo, July 4, 1848, 9 Stat. 922, acquiring New Mexico from Mexico. As a part of this treaty, the United States swore to protect the rights of the Pueblo Indians to whom the King of Spain had given land in 1689. New Mexico v. Aamodt, 537 F.3d 1102, 1111 (10th Cir. 1976). Among these Pueblos was the Pueblo of Santa Clara, on which Defendant's land lies.

---

[1] This gap stems from a critical distinction between the wording of 18 U.S.C. § 1151(a) and (b). According to 18 U.S.C. § 1151(a), federal criminal jurisdiction over Indian reservations attaches to the reservation's property. As the Supreme Court explained in Solem v. Bartlett, 18 U.S.C. § 1151(a) "uncouple[d] reservation status from Indian ownership, and statutorily define[d] Indian country to include lands held in fee by non-Indians within reservation boundaries." 465 U.S. 463, 468 (1984). By comparison, 18 U.S.C. § 1151(b) lacks the uncoupling language, perpetuating for dependent Indian communities a structure of federal criminal jurisdiction that purportedly attached to the community itself.

5

Although Indian nations and tribes could not convey good title to their lands, the Supreme Court held in United States v. Joseph that the Pueblo Indians were not "Indian tribes" for the purposes of 25 U.S.C. § 177 and could therefore freely transfer title to their land. 94 U.S. 614, 618 (1876). Joseph permitted some 3,000 non-Indians to acquire putative title to Pueblo land. Mountain States Tel. & Tel. Co., 472 U.S. at 243.

These putative titles provoked land ownership disputes, prompting Congress to enact the Pueblo Lands Act of June 7, 1924, ch. 331, 43 Stat. 636 ("PLA"). See Antonio, 936 F.3d at 1121. Under the terms of the PLA, "[c]ontinous, open, and notorious adverse possession by non-Indian claimants, coupled with payment of taxes from 1889 to the date of enactment in 1924, or from 1902 to 1924 if possession was under color of title, sufficed to extinguish a Pueblo's title." Mountain States Tel. & Tel. Co., 472 U.S. at 244 (citing PLA § 4, 43 Stat. 636). To adjudicate these disputes, the "PLA established the Pueblo Lands Board." United Stats v. Arrieta, 436 F.3d 1246, 1249 (10th Cir. 2006) (citing PLA § 2 at 633–37). If the Board determined a non-Indian's possession of land qualified under the terms of the PLA, the Board would "issue[] patents to quiet title" to the non-Indian possessor and extinguish the Pueblo's title and right to the property. Id. (citing PLA § 4, 43 Stat. at 637). This procedure permitted "pockets of privately owned, non-Indian land amidst Pueblo lands," Id. at 1249–50, creating ambiguity about whether these pockets were "Indian country" subject to federal jurisdiction. Antonio, 936 F.3d at 1121.

6

To clarify the scope of federal jurisdiction under the PLA, Congress passed the 2005 Amendment to the PLA, explaining that federal "jurisdiction [exists] over offenses committed anywhere within the exterior boundaries of any grant from a prior sovereign, as confirmed by Congress or the Court of Private Land Claims to a Pueblo Indian tribe of New Mexico." Pub. L. 109–133, 119 Stat. 2573 (Dec. 20, 2005), codified at 25 U.S.C. § 331; accord Antonio, 936 F.3d at 1121.

We derive our "simple, two-part" test for federal jurisdiction over dependent Indian communities from the 2005 Amendment, including land patented to non-Indians under the terms of the PLA. Federal courts have criminal jurisdiction if (1) the land is within the exterior boundaries of a grant from a prior sovereign, and (2) Congress or the Court of Private Land Claims have confirmed the exterior boundaries.[2] Antonio, 936 F.3d at 1124.

B.

We conclude that Defendant shot and killed Maria Gallegos in Indian country. Thus, the district court had federal jurisdiction over Defendant's crime.

In reaching this conclusion, we first ask whether Defendant's property is within the exterior boundaries of a grant from a prior sovereign. Both parties agree that the property is located within the exterior boundary of the Pueblo of Santa Clara. Both parties agree that the King of Spain created the Pueblo of Santa Clara by a land

---

[2] Neither party claims, nor does the record show, that the Court of Private Land Claims took any action relevant to this proceeding, so we look only for Congressional confirmation.

grant. Both parties agree that, as in Antonio, Congress properly patented the property to non-Indian owners under the terms of the PLA. These concessions fulfill the first prong of the PLA's test for Indian country.³  Antonio, 936 F.3d at 1124.

We also hold that Congress confirmed the exterior boundaries of the Pueblo of Santa Clara in the Confirmation Act of December 22, 1858, saying "this *confirmation* shall only be construed as a relinquishment of all title and claim of the United States to any of said lands," and "this *confirmation*" was the land "reported upon favorably by the surveyor-general of New Mexico."  11 Stat. 374, 374 (1858) (emphasis added).  As we held in Antonio, this language is explicit congressional confirmation of the Spanish land grants to the Pueblo of Santa Clara.  936 F.3d at 1123.  This language fulfills the second prong of the 2005 Amendment's Indian country test.  Id. at 1124.

Having analyzed both prongs of the PLA's test for Indian country under the framework set forth in Antonio, we conclude that Defendant's property is Indian country under 18 U.S.C. § 1151.  Therefore, Defendant's crime is subject to federal criminal jurisdiction under 18 U.S.C. § 1152.⁴

---

³ Defendant argues that the property is not part of a dependent Indian community because it does not meet the standards established in Alaska v. Native Village of Venetie Tribal Government, 522 U.S. 520, 527 (1998). [Appellant's Br. at 22–23.]  Because Venetie predates the 2005 Amendment on which we based our reasoning in Antonio, 936 F.3d at 1124, we decline to apply it.

⁴ Defendant argues Antonio does not resolve his jurisdictional challenge because Antonio dealt only with whether land met the two-part test in Section (a) of the 2005 Amendment—not whether the land qualified for federal criminal

III.

Defendant next claims the 2005 Amendment is unconstitutional as applied to him. We review this constitutional issue de novo. United States v. Muhtorov, 20 F.4th 558, 630 (10th Cir. 2021) (citing United States v. Lustyik, 883 F.3d 1263, 1267, 1271 (10th Cir. 2016)), cert. denied, 143 S. Ct 246 (2022).

Defendant's argument rests on the premise that the PLA "ha[d] the effect of extinguishing federal jurisdiction" over land owned by non-Indians within the exterior boundaries of a Pueblo. Accordingly, Defendant argues that the 2005 Amendment reclaimed his property to federal jurisdiction—an unconstitutional act according to Defendant. But because Defendant's premise is mistaken, we reject his conclusion and affirm.

This is not an issue of first impression. We held in Antonio that the PLA did not "exempt any specific properties or terminate federal jurisdiction" over Pueblo

---

jurisdiction under Section (c): that the charged offense be "described in chapter 53 of title 18, United States Code." See 119 Stat. 2573. Specifically, Defendant argues that Antonio did not address whether the land at issue met one of the three categories of "Indian country" in 18 U.S.C. § 1151. We are not persuaded. Antonio explains that "[t]he United States has jurisdiction over crimes committed within Indian Country as defined by 18 U.S.C. § 1151." Antonio, 936 F.3d at 1120. This court then explained, as we have above, that Congress passed the 2005 Amendment to clarify criminal jurisdiction on Pueblo lands. Id. Further, Antonio states that whether the United States has criminal jurisdiction turns on "whether the [offense] occurred on a tract of land covered by the" 2005 Amendment. Id. at 1121. After applying the 2005 Amendment's two-part test, this court held that "the charged offense occurred in Indian Country." Id. at 1124. In other words, Antonio held that if land meets the requirements under Section (a) of the 2005 Amendment, it is Indian country, and the United States has criminal jurisdiction. Therefore, we reject Defendant's attempt to distinguish Antonio.

9

land held by non-Indians. 936 F.3d at 1123. We also explained that the transfer of Pueblo land to non-Indians under the PLA had no effect on jurisdiction because the PLA "does not even mention jurisdiction." Id. at 1124. Instead, the PLA only "quieted title to the tracts of disputed land." Id. Because the PLA did not contain a "clear directive from Congress exempting [defendant's] land[] from jurisdiction," we hold that federal jurisdiction persisted.[5] Id. at 1123–1124.

We also hold that the 2005 Amendment did not unconstitutionally extend federal criminal jurisdiction to Defendant's land. As we recognized in Antonio, where the federal government had jurisdiction before the PLA, the PLA did not change it. Id. The 2005 Amendment did not extend federal criminal jurisdiction to Defendant's property because the PLA did not terminate federal jurisdiction over Defendant's property. In other words, the 2005 Amendment only exercised preexisting federal jurisdiction over Defendant's land and was thus not an unconstitutional enactment as applied to Defendant.[6]

---

[5] Defendant has not argued that the Supreme Court's decision in McGirt v. Oklahoma affects our analysis or our holding in Antonio. 140 S.Ct. 2452, 2462–63 (2020). We therefore do not answer whether the PLA's language was a clear expression of Congress' intent to "divest a reservation of its land [or] diminish its boundaries"; nor do we answer whether McGirt's territory divestment analysis cross-applies to jurisdiction stripping. Id.

[6] Defendant argues that we should read the 2005 Amendment to alter federal jurisdiction because, by its title—"Amendment"—Congress intended to modify federal jurisdiction. [Appellant's Br. at 36] This argument is unpersuasive for three reasons. First, we give power to the language, not the intent, of statutes. A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 30 (2012); Oliver Wendell Holmes, The Theory of Legal Interpretation, 12 Harv. L. Rev. 417, 419

IV.

Together with his jurisdictional arguments, Defendant contends that the district court erred in declining his request for a two-level sentence reduction for accepting responsibility for his crime.

We review the district court's determination of whether a defendant accepted responsibility for clear error.[7] United States v. Amos, 984 F.2d 1067, 1071 (10th Cir. 1993) (citing United States v. Spedalieri, 910 F.2d 717, 712 (10th Cir. 1990)). Because the sentencing judge is uniquely positioned to evaluate each defendant's acceptance of responsibility, we give great deference to the sentencing judge's determination. United States Sentencing Commission's Guidelines Manual (U.S.S.G.) § 3E1.1, comment., n.5. For this reason, we will not disturb a district court's determination about whether a defendant accepted responsibility "unless it is without foundation." Lindsay, 184 F.3d at 1143 (quoting United States v. Amos, 984 F.2d 1067, 1071–72 (10th Cir. 1993)).

Under U.S.S.G. § 3E1.1(a), a district court should reduce a defendant's offense level by two levels "[i]f the defendant clearly demonstrates acceptance of

---

(1899) ("We do not inquire what the legislature meant; we ask only what the statute means."). Second, this Court has held on at least two occasions that the 2005 Amendment "clarified criminal jurisdiction" under the PLA, rather than modified it. Antonio, 936 F.3d at 1121; accord Arrieta, 436 F.3d at 1251. Lastly, we are not persuaded that the canon against superfluity stretches to after-the-fact legislation; this is to say, we can best understand the breadth of legislation by its text, not by presuming the non-redundancy of later legislation.

[7] Defendant's objection during sentencing preserved this issue.

responsibility for his offense." As the commentary clarifies, however, a defendant is not eligible for this reduction if he denies "the essential factual elements of guilt" at trial, even if he expresses remorse after conviction. U.S.S.G. § 3E1.1, comment., n.2. Accordingly, although a defendant has a constitutional right to trial, exercising that right "will commonly render him ineligible for a § 3E1.1 reduction."[8] United States v. Tom, 494 F.3d 1277, 1281 (10th Cir. 2007) (citing United States v. Salazar-Samaniega, 361 F.3d 1271, 1280–81 (10th Cir. 2004)).

Appellant argues he qualifies for an exception to this rule even though he pled not guilty. A district court may extend an acceptance of responsibility reduction if "the defendant 'admitted to all the conduct with which he was charged' but 'simply disputed whether his acknowledged factual state of mind met the legal criteria of intent' required by the statute." Sims, 428 F.3d at 961 (quoting United States v. Gauvin, 173 F.3d 789, 806 (10th Cir. 1999)).

Despite this exception, a defendant is not eligible for the § 3E1.1(a) reduction if he "challenge[s] the factual element of intent." Tom, 494 F.3d at 1281. For example, in Salazar-Samaniega, we concluded that a defendant had "forfeited his claim to an adjustment under § 3E1.1" because he "argued at trial that the government did not present sufficient evidence to prove the factual element of intent." 361 F.3d at 1281. Similarly, in United States v. Hill, we denied a § 3E1.1(a)

---

[8] We have recognized that it is the exception, rather than the rule, for a district court to extend an acceptance of responsibility adjustment after trial. United States v. Sims, 428 F.3d 945, 960 (10th Cir. 2005).

12

adjustment because the defendant contended "that his conduct was innocent and without intention" to commit the charged crime. 197 F.3d 436, 446–47 (10th Cir. 1999). We also decided in Tom that the defendant was ineligible for a § 3E1.1(a) adjustment because he argued "that he lacked the mens rea requisite" for his offense, and because he "challeng[ed] the government on the issue of intent." 494 F.3d at 1281–82.

The district court did not commit clear error. Defendant argued that the jury should acquit him because he lacked the requisite mens rea for second-degree murder and "it was not his intent to hurt anyone or kill anyone." Defendant argued that he did not intend to shoot the trespasser and that he intentionally aimed his gun away from where he had seen the person. Defendant further argued that he acted in self-defense.[9] Lastly, Defendant argued that the Government would be unable to prove that the person Defendant shot was the same person Defendant saw trespassing, an argument that intimates that Defendant did not intend to shoot the person he saw.

These statements provide a clear basis to conclude that Defendant challenged the factual element of intent at trial. Thus, the trial record sufficiently supports the district court's determination that Defendant did not accept responsibility.

---

[9] Although Defendant later admitted that he was not acting in self-defense, his initial representation still "put the government to its burden of proof at trial." See Tom, 494 F.3d at 1281. Defendant even reassumes the self-defense mantle on appeal, representing in his brief that, because he was "[a]fraid the person would shoot him, he fired quickly several more times."

13

The district court did not clearly err by determining Defendant was ineligible for an adjustment under § 3E1.1(a).

    AFFIRMED.